FILED
2023 JUL 26 PM 2:35
CLERK
U.S. DISTRICT COURT

TRINA A. HIGGINS, United States Attorney (#7349)
CY H. CASTLE, Assistant United States Attorney (#4808)
STEWART M. YOUNG, Assistant United States Attorney (#14377)
STEPHEN P. DENT, Assistant United States Attorney (#17405)
PETER KUHN, Special Assistant United States Attorney (#3820)
Attorneys for the United States of America
111 South Main Street, Ste. 1800 • Salt Lake City, Utah 84111
Telephone:  (801) 524-5682

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>WILLIAM J. BOWSER, CHRISTOPHER J. ASHBY, SCOTT W. BEYNON, JORDAN S. NELSON, SCOTT L. RUTHERFORD, JOHN D. HAMRICK, and EDMUND & WHEELER, INC.,<br><br>  Defendants. | **INDICTMENT**<br><br>COUNT 1: 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud)<br><br>COUNTS 2 -18: 18 U.S.C. § 1343 (Wire Fraud)<br><br><br>Case: 2:23-cr-00281<br>Assigned To : Waddoups, Clark<br>Assign. Date : 7/25/2023 |

The Grand Jury charges:

## Overview of the Scheme

1.      From at least January 2015, and continuing through May 2019, WILLIAM

("BIL") J. BOWSER, CHRISTOPHER J. ASHBY, SCOTT W. BEYNON, JORDAN S.

NELSON, SCOTT L. RUTHERFORD, JOHN D. HAMRICK, and EDMUND & WHEELER,

INC. (collectively, the "DEFENDANTS"), and others whose identities are known and unknown

to the grand jury, conspired with one another, to engage in a nation-wide scheme to defraud

mostly retired and elderly individuals of more than $30,000,000 by inducing them to invest in

tenant-in-common interests in event venues.

2.      BOWSER, the founder and (former) President of Noah Corporation ("Noah" or sometimes referred to as "Noah's"), along with ASHBY, BEYNON, NELSON and RUTHERFORD, the founders and owners of Rockwell Debt Free Properties, and HAMRICK, Vice President and Director of EDMUND & WHEELER made material misrepresentations and omissions to sell fractional, tenant-in-common interests in Noah event centers (herein, the "Noah TIC Interests"). The Noah event centers were, collectively, an unprofitable enterprise sustained only through infusions of new investor funds.

3.      The DEFENDANTS did not use investor funds as promised in their marketing materials, purchase agreements and related representations. They misappropriated and diverted investor funds meant for the development and construction of new event centers to pay large commissions, Noah's operations, prior investors, construction costs of other event centers, and rents on previously sold Noah event centers.

### Relevant Persons and Entities

Noah Corporation

4.      Noah was a Utah corporation formed in 2003 with its principal place of business in Lehi, Utah County, Utah. It operated forty-two commercial event centers across the United States for "all of life's events."

5.      BOWSER was a resident of Salt Lake City, Utah and founder and President of Noah and managed and controlled its operations.

6.      Gabriel Management Corporation ("Gabriel") was a Utah corporation formed in September 2005 with its principal place of business in Lehi, Utah County, Utah.

BOWSER owned and controlled Gabriel and was its President and sole Director.  Gabriel developed event center properties and operated as Noah's construction arm.

7.     DUO Venues, LLC, was another company founded by BOWSER and a subsidiary of Noah.  The original business purpose behind DUO Venues was to locate, market and rent properties for outdoor weddings.  By June of 2017, the financial operations of Noah had been transferred to DUO Venues.

Rockwell Debt Free Properties, Inc.

8.     Rockwell Debt Free Properties ("Rockwell") was a Utah corporation, formed in 2009 with its principal place of business in Sandy, Salt Lake County, Utah.  Rockwell previously operated as Rockwell TIC, Inc., a Utah Corporation formed in 2006.  Rockwell was formed to purchase and resell commercial properties to Tenant-in-Common investors.

9.     ASHBY was a resident of Salt Lake County, Utah and founding partner and President of Rockwell.  According to Rockwell's website, he was "primarily responsible for creating and managing all relations with clients, and potential clients, as well as establishing strategic relationships with referral partners and other industry professionals and participated in all decisions related to property acquisitions."

10.     NELSON was a resident of Salt Lake County, Utah.  He was a founding partner, Director of Operations for Rockwell Debt Free Properties.  According to Rockwell's website, NELSON led "all aspects of customer service and support and business support within the company" and "coordinate[d] all the logistical elements involved in the purchase and sale of Rockwell Debit-Free properties."

11.     BEYNON was a resident of Davis County, Utah. According to Rockwell's

3

website, he was a founding partner, director and the Executive Vice President of Real Estate for Rockwell Debt Free Properties. Rockwell's website stated BEYNON was "responsible for overseeing the process of research and analysis conducted in conjunction with the acquisition of new properties" and "gathers and packages all pertinent due diligence information relative to each property offering so that potential buyers can conduct a thorough review of all important aspects of the real estate purchase."

12. RUTHERORD was a resident of Utah County, Utah and a former founder, initial director and Executive Vice President of Marketing for Rockwell Debt Free Properties.

13. HAMRICK was a resident of New Hampshire doing business in the State of Utah.

14. EDMUND & WHEELER, Inc. was a New Hampshire corporation doing business in the State of Utah. HAMRICK was the Vice President and Director of Edmund & Wheeler, who holds a real estate license with the state of New Hampshire.

### Background

### Noah Corporation and Bil Bowser

15. Noah, through BOWSER, began developing and operating event centers around 2005. BOWSER envisioned a national network of high-end event centers and sold investors on that vision. Noah opened its first event center in January 2007, and by May 2019, Noah operated forty-two event venues across the United States.

16. Around 2013, BOWSER decided to sell Noah's event centers (buildings and real property) and lease them back as a tenant, rather than being an owner-operator of the event

centers. By doing so, BOWSER was able to obtain influxes of cash for current obligations, albeit with the result that Noah's liabilities and monthly expenses increased dramatically because Noah was obligated to make rental payments to the purchasers of the event centers.

17.     BOWSER established Gabriel and later DUO Venues, to develop Noah's event center properties. Although Gabriel, DUO Venues, and Noah had separate bank accounts, BOWSER continually transferred and commingled funds among the accounts. Many of the event centers were losing money. Without the continual influx of investor monies, Noah could not have sustained the operations of its event centers.

18.     All or most of the funds Noah obtained from approximately January 2015 through February 2019 came from new investor funds.

### Rockwell Debt Free Properties, Inc.

19.     ASHBY, BEYNON, NELSON, and RUTHERFORD formed Rockwell for the purpose of purchasing and reselling commercial properties (sometimes referred to herein collectively as the "ROCKWELL DEFENDANTS"). The reselling of properties involved selling fractional, tenant-in-common interests primarily to retired and elderly individuals.

20.     In 2013, Rockwell began soliciting investors to purchase Noah TIC Interests. Initially, the event centers that were the subject of the Noah TIC Interests were already fully developed and operating.

21.     In or around 2015, ASHBY, BEYNON, NELSON, RUTHERFORD, and BOWSER agreed to develop additional properties together. Pursuant to the parties' agreements, BOWSER was to locate new properties (in the form of raw land) and construct event centers on those properties. Rockwell was to provide funds to purchase the raw land

in the name of a Utah limited liability company and finance the development and construction of each event center.  Rockwell, as owner of each new property, would then negotiate and enter into a lease agreement with Noah as the tenant.

22.     As ASHBY repeatedly described it, Rockwell would purchase a whole pizza (a commercial property) and then sell to TIC investors undivided fractional interest (by the slice) in the property.  The properties were sold at above market prices supported by inflated lease rents to fund the land purchase and construction costs, and the leases were subsequently assigned to the Noah TIC Interest investors.  By July 2019, Rockwell had purchased 42 Noah properties for investment and resale to investors.

23.     The DEFENDANTS largely targeted investors who were older, retired, and seeking a low-risk, stable, and passive income stream through what is known as a "1031 Tax Exchange."  The primary source for Rockwell's funding for Noah properties came from a network of financial planners, 1031 Exchange specialists, real estate brokers, attorneys and other salespeople who had an ongoing business relationship with Rockwell and received substantial referral fees from Rockwell.

24.     HAMRICK and EDMUND & WHEELER (New Hampshire) were a major referral source of investors to Rockwell (Utah) living in the New England states.  HAMRICK had a long-standing business relationship with ROCKWELL DEFENDANTS, communicated with them frequently by telephone and email, and referred to them as his "partners."  He referred to his business location in New Hampshire as "Rockwell East."

### Requirements for 1031 Tax Exchanges

25.     Section 1031 of the Internal Revenue Service Code allows individuals who

6

have earned capital gains from the sale of real estate to legally defer paying federal taxes on those gains when they are reinvested in a similar property.

26.     Section 1031 investments are attractive to retired and elderly individuals because they can defer capital gains tax liability from a prior sale of real estate and allows them to make passive investments in like-kind property and earn income for retirement from rents generated by the properties based upon the efforts of others.

27.     To facilitate a Section 1031 Exchange, taxpayers typically engage a qualified intermediary or accommodator ("QI") to receive and hold the net sale proceeds from the sale of original property in an escrow account, and then use those funds to acquire a new property on behalf of the taxpayer.

28.     HAMRICK served as a Qualified Intermediary ("QI") for those investors referred to Rockwell as investors seeking to complete a 1031 Tax Exchange.  In return, HAMRICK and EDMUND & WHEELER were paid a commission from the investor's investments in Noah TIC properties.

**First American Title Insurance Company**

29.     During the period from approximately January 2016 to May 2019, Rockwell used First American Title Company ("FATCO") and its escrow agent, K.P. to close the purchase and sale of Noah TIC Interests.  FATCO is one of the oldest and largest title companies in the United States and conducts business in Utah from, among other places, its office in Salt Lake City, Utah.

30.     FATCO not only provided title insurance services, including issuing policies of title insurance to Rockwell and to the TIC Investors, but it also served as an escrow

7

agent, receiving the investors' payments to purchase the Noah TIC Interests as part of the closing.

31.     FATCO, from its Salt Lake City office, closed Rockwell's purchase of approximately 40 TIC properties and its sale of Noah TIC Interests to at least 400 investors.

**Rockwell Knew about Noah's Financial Problems**

32.     From at least March 2015 through May of 2019, ASHBY, BEYNON, NELSON, RUTHERFORD, and HAMRICK reviewed Noah's financial statements showing that Noah was operating at net losses in 2014, 2015 and 2016 of $3.1 million, $3.3 million, and $3.2 million, respectively. The financial statements further showed that Noah had accumulated losses of approximately $8 million and had only $3.5 million in assets with $11.5 million in liabilities.

33.     In March of 2015, after speaking to BOWSER, ASHBY and C.B. with EDMUND & WHEELER and reviewing Noah's 2014 financial statements, a Certified Investment Advisor stated in an email:

> - **Credit/ Business Risk** - The lease will be with a single private company (Noah's), that both built and will occupy this space. **This investment is not only a bet on the success of this property, but also on the success of this company.** Noah's finances reveal a troubling history of large amounts of bad debt that needed to be written off and restructured. Furthermore, Noah's financial statements make it look more like a real estate development company than an event venue provider. Our hunch is that at this point in time, Noah's management has made its money by building each property and selling at "full" valuations to (possibly not fully informed) investors. We have compared the asking price for Noah's locations to other nearby commercial real estate currently offered for sale, and find the comparisons to be unfavorable. It is not clear that the ongoing business will be successful over the next ten or twenty years. By their own admission Noah's is pursuing an industry-changing growth plan. If it fails, we would assume that you, along with the other TIC investors, will be on the hook for renovating for the next

tenant, who may be paying a much lower rent, meaning less income for you. We would have more comfort with a more established (especially public) company with frequent financial transparency, or better yet, multiple properties with tenant diversification.

34.     In June 2015, RUTHEFORD complained by email to BEYNON that including financial information with the specific-property promotional materials had caused him to lose a couple of sales.  Later that same day, RUTHERFORD emailed BOWSER stating he thought it would be wise no longer to include "property-specific information in future financials summaries for us to provide to clients."

35.     Specifically, in late October 2016, ASHBY, BEYNON, and RUTHERFORD had an email conversation in response to an email sent by Noah's accounting firm regarding Noah's 2016 first quarter consolidated financial statements showing a net loss of $1,190,000.  The statements shared among ASHBY, BEYNON, and RUTHERFORD expressed concern that without the ability to count unearned income (event center deposits) the financials "screamed 'run for the hills!'", the financial statements should not be distributed outside of the Rockwell family because they could come back to bite [Rockwell] and Noah and they "should just be destroyed."

36.     The accounting firm's cover letter accompanying Noah's 2016 balance sheet stated:

> Management has elected to omit substantially all of the disclosures required by accounting principles generally accepted in the United States of America. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the Company's financial position, results of operations, and cash flows.  Accordingly, the financial statements are not designed for those who are not informed about such matters.

9

37.     In or around late 2016 and early 2017, BOWSER and ASHBY had discussions about Noah's financial difficulties, including Noah's construction cost overruns, construction delays, and other issues.  Based on these representations by BOWSER, Rockwell loaned Noah $6 million in February 2017 based on an unsecured promissory note.

38.     The $6 million loan did nothing to alleviate Noah's financial problems. The money was quickly spent to satisfy current obligations, including rents due to Noah TIC Interest investors.

39.     In January 2018, in response to an email from one of the property managers concerned with purported late Noah rent payments to which BEYNON and BOWSER were copied, ASHBY stated that Noah had gone "through a challenging transition last year [2017] as a necessary part of the growth process" and "their cash flow has been much tighter than they're accustomed to the last several months and will likely remain so for a few more months."

40.     In February 2018, in response to an email received from ASHBY with Noah's 2014, 2015 and 2016 Combined Profit and Loss statement, a Certified Investment Advisor expressed his concerns about Noah's financial health:

> Thanks for the financials.  The company seems to be growing at all costs and has no earnings.  In addition, their presentation of financials looks to count 'unearned revenues toward cash flow but that is not real cash flow as they still need to pay payroll and other variable expenses against those further revenues.'  The EBITA number seems to tell a more complete story but without seeing the balance sheet it is difficult to see how they are financing the negative cash flow.  Would it be fair to say the credit risk of the company relies on the ongoing funding of cash shortfall from the owners?

41.     In July 2018, BEYNON, ASHBY, and HAMRICK were aware that Noah was

late in making its property tax payments.  In an email from HAMRICK to ASHBY and

BEYNON, HAMRICK stated,

> Hi Scott:
> Did we come up for a reason this [Fairview] property tax bill was not paid? . .
> . . I've already used the excuse that 'there is a new person handling these' at
> Noah's so that won't fly. . . . If we don't have a reason, then we don't but I'm
> truly hoping that it is something better than Noah's is behind on their property
> tax bills.

42.     In August 2018, BOWSER sent an email to ASHBY and BEYNON

informing them he had failed to pay "subs from back as far as April" and wanted "to remove

the wolves over the next few draws" to "make up for all of the skipped payments." These

draws diverted funds committed to the construction of other Noah event centers.

43.     Only by "stealing from Peter to pay Paul" were the DEFENDANTS able to

conceal the poor performance of the event centers.

## Count 1
### 18 U.S.C. § 1349
### (Wire Fraud Conspiracy)

44.     Paragraphs 1-43 are incorporated by reference as though fully set forth

herein.

45.     Beginning sometime in and around January 2015, and continuing through

May 2019, and continuing until the present, in the District of Utah and elsewhere,

**WILLIAM J. BOWSER,
CHRISTOPHER J. ASHBY,
SCOTT W. BEYNON,
JORDAN S. NELSON,
SCOTT L. RUTHERFORD.
JOHN D. HAMRICK, and
EDMUND & WHEELER, INC.,**

11

defendants herein, and others whose identities are known and unknown to the Grand

Jury, did knowingly and willfully combine, conspire, confederate, and agree together and

with each other, with interdependence among the members of the conspiracy, to commit

Wire Fraud in violation of 18 U.S.C. §§ 1343 and 1349.

## OBJECT OF THE CONSPIRACY

46.     The object of the conspiracy was for the DEFENDANTS, and others known

to the Grand Jury, to defraud individuals by inducing them to invest in Noah's event centers

through false statements, misrepresentations, deception, fraudulent conduct, and omissions

of material facts in order to unlawfully enrich the DEFENDANTS in the following manner

and means.

## MEANS AND MATTER AND OVERT ACTS

47.     In furtherance of the conspiracy to engage in a scheme and artifice to defraud,

the DEFENDANTS, together with others, employed the following means and matters and

overt acts.

48.     Through the use of the internet, telephone, email, and other means, the

DEFENDANTS promoted, offered and sold fractional Tenant-in-Common interests in five Noah

event centers through the use of a network of financial planners, 1031 exchange specialists, real

estate brokers and other salespeople; using glossy marketing materials showing pictures of

beautifully constructed buildings and promising impressive long-term financial returns.

### Promotion and Sale of TIC Interests

49.     To induce investors to purchase Noah TIC interests and to give the false

12

appearance that Noah was a thriving company, the DEFENDANTS, as co-conspirators, made the following misrepresentations verbally and through their marketing materials:

a.  Noah has "demonstrated [the] ability to examine and modify [its] business to achieve maximum profitability."

b.  "Noah's anticipates revenues to well exceed the debt service and operating cost with their breakeven well below their currently operating occupancy levels."

c.  Rockwell enters into leases with "excellent corporate tenants that are financially strong, national company[ies] who pay[] all of the taxes, insurance and maintenance for the property."

d.  Each of Rockwell's leasing partners "is performing perfectly" and "no Rockwell Client has ever missed a monthly payment."

e.  Rockwell has "conducted a thorough analysis of [Noah's] business model, credit worthiness, industry position, profitability and staying power."

f.  Noah's business and operations are "recession-resistant."

g.  Their investments were solely dependent on the performance of the specific event venue in which individuals would invest.

h.  Investors in Rockwell's properties "benefit[] from all of the income, tax shelters and appreciation" and the sale of its properties "satisfies the IRS requirements under 1031 exchanges."

i.  The investment properties were unencumbered by a mortgage and are otherwise "debt free" and "with no debt to service, all income will be

13

deposited directly into [investors] bank account."

j.      The "[p]roperty is offered with "no closing costs."

k.      An overall 8.5% average return on their investment over the life of the 20-year Noah lease.

l.      Noah would make rents payments at the time of the investor's purchase of the Noah TIC Interest.

m.      TIC Investors' money would be placed into escrow at FATCO and disbursed only to purchase an interest in a specific property or to pay for the construction of improvements on the property on a reimbursement basis.

n.      The purchased event centers were under construction or already constructed and were booking events.

o.      "[F]or all practical purposes, Rockwell becomes the de facto guarantor that the building will get built."

p.      The investment was no-risk because Rockwell guaranteed that "if the property does not perform as promised during your first six months of ownership, we will buy it back."

q.      Every lease came with a corporate guarantee, meaning the leases were "backed by the financial strength and resources of the entire company."

r.      Noah did not have financial statements to provide TIC investors because it was a private company.

50.      As a further fraudulent inducement for investors, the marketing materials contained glossy photos and renderings of a what appeared to be completed event centers

but were not photographs of an actual building located on the investment property.

51.     In furtherance of their conspiracy to engage in the scheme and artifice to defraud, the DEFENDANTS failed to disclose to investors the following material facts, among others:

a.     FATCO disbursed TIC Investors' funds to Rockwell as soon as Rockwell purchased the land for a new event center.  Rockwell did not separately escrow TIC Investors' funds for each specific Noah TIC investment.  Rather, it commingled the funds from one Noah TIC investment with all other funds Rockwell received from other Noah TIC investments and from Rockwell's operations.

b.     Rockwell disbursed TIC Investors funds to Gabriel, Noah's construction arm, and then Duo Venues upon receiving draw requests BOWSER caused to be sent.  The draw requests consisted of a form spreadsheet in the name of a specific event center with a list of various construction expenditures.

c.     Event venues were operated as a single integrated enterprise, with funds from one event venue used to prop up other event venues and where investor money was commingled with operational revenue.

d.     Rockwell would take up to a twenty percent commission for the purchase price from Noah TIC Investors.

e.     From the commission taken by Rockwell, it would pay HAMRICK and other referral sources up to a five percent commission of the purchase price from Noah TIC Investors for the referral of investors to Rockwell.

f.     Rockwell paid the first nine months of rent after the investor's purchase, not

15

Noah, from the commission Rockwell took from the purchase price.  Many
investors believed that those undeveloped event centers in which they
purchased interests were completed and already generating revenues at the
time of their purchase, based on the information contained in the written
marketing materials and representations made to them by all Defendants as
well as their receipt of monthly rental payments.

g.   The rents Noah agreed to pay under its lease agreements were well above-market
rental rates.

h.   Noah's ability to pay rent on other event centers was contingent upon cash from
other properties or infusions of money from new investors.

i.   Rockwell regularly disbursed funds to Gabriel, and then Duo Venues, from
TIC Investors' funds unrelated to the name of the event center on the
spreadsheets.

j.   In early 2017, Rockwell provided an unsecured loan to Noah for over $6
million to bail out Noah's "for the sole purpose of acquiring, developing, and
/or constructing commercial properties."

k.   Defendants had received and were in possession of Noah's financials.

l.   At least by 2017, Noah was experiencing significant financial hardship and
tight cash flow due to its excessive growth across the country.  BOWSER
communicated to Rockwell that it was not profitable.

m.   Noah continued to suffer financial hardship in 2018.

16

    n.     Noah had never completed any event venue anywhere in the country from the ground up in under nine months.

    52.    To effectuate the purchase of TIC interests in the following five Noah event centers on the dates set forth below, the investors and defendants used the Internet to email purchase-related documents to FATCO and caused interstate wires to transfer investors' funds to Rockwell. All closings of investors' purchases occurred at the Salt Lake City office of FATCO.

**Dublin, Ohio Property -- Purchase Price $5,930,000**

| Investor | Amount of Investment (Approx) | Amount Received by Rockwell (Approx) | Deposit Date (on or about) into Rockwell account |
|---|---|---|---|
| W.W. & S.W. | $200,000 | $198,999.50 | October 5, 2017 |
| J.S. & J.S. | $500,000 | $498,299.50 | October 5, 2017 |
| T.A. | $212,116.57 | $210,991.84 | October 13, 2017 |
| I.F. | $150,000 | $148,999.50 | October 13, 2017 |
| T.F. | $150,000 | $148,999.50 | October 16, 2017 |
| M.S. | $150,000 | $148,999.50 | October 20, 2017 |
| C.V. | $670,053.26 | $668,012.65 | October 24, 2017 |
| P.B. & J.B. | $150,000 | $148,999.50 | October 26, 2017 |
| R.T. & L.T. | $403,140.11 | $401,633.33 | October 30, 2017 |
| H.S. | $304,473.94 | $303,164.49 | October 31, 2017 |

| A.S. | $150,000 | $148,999.50 | November 17, 2017 |
| C.C. | $400,000 | $397,799.50 | November 7, 2017 |
| T.H. & J.H. | $100,000 | $99,099.50 | November 7, 2017 |
| R.S. & J.S. | $150,000 | $144,499.50 | November 13, 2017 |
| J.L. | $200,000 | $198,899.50 | November 21, 2017 |
| M.D. | $300,000 | $298,699.50 | November 21, 2017 |
| G.W. | $177,265.16 | $176,210.13 | December 11, 2017 |
| C.L. & D.L. | $400,000 | $398,499.50 | December 13, 2017 |
| B.G. | $300,000 | $298,699.50 | January 16, 2018 |
| R.A. | $730,000 | $727,839.50 | February 21, 2018 |
| R.C. & R.C. | $132,225 | $131,260.05 | March 12, 2018 |

**Jacksonville, Florida Property -- Purchase Price $6,055,000**

| Investor | Amount of Investment (Approx) | Amount Received by Rockwell (Approx) | Deposit Date (on or about) into Rockwell account |
| --- | --- | --- | --- |
| B.A. and J.A. | $252,240.32 | $249,774.64 | April 5, 2018 |
| E.S. and S.S. | $389,128.03 | $385,704.13 | April 11, 2018 |
| The G.S.C. Trust | $150,000 | $148,250 | April 12, 2018 |
| R.G. and L.G. | $200,000 | $197,900 | April 13, 2018 |
| L.Q.L. | $150,000 | $148,250 | April 27, 2018 |

| Ambleside Park, Inc. | $1,500,000 | $1,488,800 | April 27, 2018 |
| E & H Jackson, LLC | $164,000 | $162,152 | May 9, 2018 |
| R.H. & S.H. | $817,542.62 | $811,119.82 | May 11, 2018 |
| A.S. | $150,000 | $148,250 | May 10, 2018 |
| N.D.J. Living Trust | $520,000 | $515,261 | July 30, 2018 |
| C.F. | $1,704,475 | $1,691,843.68 | August 28, 2018 |
| N.D.J. Living Trust | $57,000 | $56,251 | September 11, 2018 |

**Carmel, Indiana Property -- Purchase Price $6,260,000**

| Investor | Amount of Investment (Approx) | Amount Received by Rockwell (Approx) | Deposit Date (on or about) into Rockwell account |
|---|---|---|---|
| CAMAC | $836,141.64 | $834,591.64 | July 5, 2018 |
| R.E.H. Revocable Trust | $1,449,125.41 | $1,448,425.41 | July 5, 2018 |
| E.A.H. 2001 Revocable Living Trust | $400,000 | $399,300 | July 5, 2018 |
| DB & MB | $151,192.04 | $150,492.04 | July 5, 2018 |
| J.W.R. Trust | $565,000 | $565,000 | July 16, 2018 |
| The F.J. Living Trust | $206,000 | $205,300 | July 18 2018 |
| B.R. & M.A.R. | $350,000 | $349,300 | July 20, 2018 |
| S.R. & H.R. | $223,215.57 | $222,515.57 | July 23, 2018 |
| Blush Properties, LLC | $369,300 | $368,600 | August 20, 2018 |

| E.R.F. | $150,000 | $149,300 | August 28, 2018 |
| S.L. & D.L. | $290,229.60 | $289,529 | September 10, 2018 |
| P.R. | $400,000 | $399,300 | September 20, 2018 |
| R.D. | $779,348.15 | $778,648.15 | September 24, 2018 |
| S.L. & D.L. | $88,875 | $88,525 | January 11, 2019 |

**Independence, Ohio Property -- Purchase Price $6,165,000**

| Investor | Amount of Investment (Approx) | Amount Received by Rockwell (Approx) | Deposit Date (on or about) into Rockwell account |
| --- | --- | --- | --- |
| BP412 LLC | $403,339.46 | $401,832.28 | August 29, 2018 |
| Maxon-Multiline, LLC | $150,000 | $148,999.50 | August 29, 2018 |
| W.M.M. Irrevocable Trust of 2012 | $500,000 | $498,299.50 | September 7, 2018 |
| T.T. | $382,012.16 | $380,547.64 | September 7, 2018 |
| AmFil Realty, LLC. | $615,362.71 | $613,431.48 | September 25, 2018 |
| G.W. | $210,000 | $208,879.50 | September 24, 2018 |
| T.M. & P.M. | $150,000 | $148,999.50 | September 26, 2018 |
| G.N. | $879,000 | $876,541.50 | September 26, 2018 |
| The T. Revocable Living Trust | $296,450 | $295,156.60 | October 3, 2018 |
| NM & AM | $179,720 | $178,660.06 | October 9, 2018 |
| J.&G. Z. Family Trust | $320,000 | $318,659.50 | October 12, 2018 |

| R.A. & A.A. | $186,252.37 | $185,179.37 | October 31, 2018 |
| B. Trust | $1,162,183.14 | $1,159,158.27 | October 31, 2018 |
| J.B. | $152,000 | $150,995.50 | November 16, 2018 |
| The Real Mint LLC | $221,875 | $201,730.75 | November 16, 2018 |

**Toledo, Ohio Property -- Purchase Price $6,115,000**

| Investor | Amount of Investment (Approx) | Amount Received by Rockwell (Approx) | Deposit Date (on or about) into Rockwell account |
| --- | --- | --- | --- |
| T.K. & D.K. | $400,000 | $398,499.50 | August 28, 2018 |
| Luann Properties, LLC | $200,000 | $198,899.50 | August 28, 2018 |
| D.S. & R.S. | $204,457.17 | $203,374.76 | August 29, 2018 |
| Oak Hill Management, Inc. | $3,554,202.60 | $3,546,393.69 | September 13, 2018 |
| N.M. & A.M. | $1,506,725 | $1,503,011.05 | October 9, 2018 |

**Counts 2-18**
18 U.S.C. § 1343
(Wire Fraud)

53.     Paragraphs 1-52 are incorporated by reference as though fully set forth herein.

54.     Beginning sometime in and around February 2017, and continuing through May 2019, and continuing until the present, in the District of Utah and elsewhere,

**WILLIAM J. BOWSER,**
**CHRISTOPHER J. ASHBY,**
**SCOTT W. BEYNON,**

21

**JORDAN S. NELSON,**
**SCOTT L. RUTHERFORD,**
**JOHN D. HAMRICK, and**
**EDMUND & WHEELER, INC.,**

defendants herein, having devised and intended to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, promises, and omissions of material facts, for the purpose of executing said scheme and artifice to defraud, did cause to be transmitted by means of wire communication certain writings, signs and signals, that is, an interstate wire, in instances including but not limited to each count below:

### Jacksonville, Florida Property

| Count | Deposit Date (on or about) | Wire Communication |
|-------|----------------------------|--------------------|
| 2 | July 30, 2018 | Wire Transfer of approximately $515,261 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investor N.D.J. Living Trust. |
| 3 | August 28, 2018 | Wire Transfer of approximately $1,691,843.57 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investor C.F. |
| 4 | September 11, 2018 | Wire Transfer of approximately $56,251 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investor N.D.J. Living Trust. |

//

//

//

//

22

## Carmel, Indiana Property

| Count | Deposit Date (on or about) | Wire Communication |
|---|---|---|
| 5 | August 20, 2018 | Wire Transfer of approximately $368,600 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investor Blush Properties, LLC. |
| 6 | August 28, 2018 | Wire Transfer of approximately $149,300 from First American Trust bank (California), account ending in 0000, to Rockwell, account ending in 2653, for Investor E.F. |
| 7 | September 10, 2018 | Wire Transfer of approximately $289,529.60 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investors S.L. & D.L. |
| 8 | September 24, 2018 | Wire Transfer of approximately $778.648.15 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investor R.D. |
| 9 | January 11, 2019 | Wire Transfer of approximately $88,875 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investors S.L. & D.L. |

## Independence, Ohio Property

| Count | Deposit Date (on or about) | Wire Communication |
|---|---|---|
| 10 | August 29, 2018 | Wire Transfer of approximately $148,999.50 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investor Maxon-Multiline, LLC. |
| 11 | September 25, 2018 | Wire Transfer of approximately $579,789.12 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investor AmFil Realty, LLC. |
| 12 | September 26, 2018 | Wire Transfer of approximately $148,999.50 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investor T.M. & P.M. |
| 13 | September 26, 2018 | Wire Transfer of approximately $876,541.50 from First |

| | | American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investor G.N. |
|---|---|---|
| 14 | October 9, 2018 | Wire Transfer of approximately $178,660.06 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investors N.M. & A.M. |
| 15 | October 31, 2018 | Wire Transfer of approximately $185,179.37 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investors R.A. & A.A. |

**Toledo, Ohio Property**

| Count | Deposit Date (on or about) | Wire Communication |
|---|---|---|
| 16 | August 28, 2018 | Wire Transfer of approximately $398,499.50 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investors T.K. & D.K. |
| 17 | August 29, 2018 | Wire Transfer of approximately $203,347.76 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investors D.S. & R.S. |
| 18 | October 9, 2018 | Wire Transfer of approximately $1,503,011.05 from First American Trust bank (California), account ending in 0000, to Rockwell (Utah), account ending in 2653, for Investors N.M. & A.M. |

55.     Despite investing approximately $30 million in the Dublin, Ohio; Jacksonville, Florida; Carmel, Indiana; Independence, Ohio; or Toledo, Ohio properties (collectively the "Five Unbuilt Properties"), and the promises and representations event venues would be constructed to satisfy the eligibility requirements for the investors' 1031 exchanges, no buildings were constructed on the Five Unbuilt Properties.  Instead, the investors' money was misappropriated and diverted investor to pay, among other things, (a) large commissions, (b) Noah's business operations, (c) prior investors, (d) construction costs of other event centers (e) and rents on

24

previously sold Noah event centers.

## NOTICE OF INTENT TO SEEK FORFEITURE

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of any

offense in violation of 18 U.S.C. § 1343 or 1349, as set forth in this Indictment, the defendant

shall forfeit to the United States of America any property, real or personal, that constitutes or is

derived from proceeds traceable to the scheme to defraud and/or the conspiracy.  The property to

be forfeited includes, but is not limited to, the following:

- A money judgment equal to the value of any property not available for forfeiture as a result of any act or omission of the defendant(s) for one or more of the reasons listed in 21 U.S.C. § 853(p); and

- Substitute property as allowed by 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(p).

A TRUE BILL:

/s/

_____
FOREPERSON OF THE GRAND JURY

TRINA A. HIGGINS
United States Attorney

_____
CY H. CASTLE
Assistant United States Attorneys
PETER KUHN
Special Assistant United States Attorney

25